**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MEDICAL MARKETING CONSULTANTS, LLC, a Florida limited liability company, MARTIN PRAEGER, and MARK SCHERMER, | ) ) ) ) ) | Civ. Action No. 06-00274 |
| | ) | |
| Plaintiffs, | ) ) | Judge Donetta W. Ambrose Magistrate Judge Caiazza |
| v. | ) ) | |
| | ) | |
| CARDIAC TELECOM CORPORATION, a Pennsylvania Corporation, and LEE EHRLICHMAN, | ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

This matter concerns an October 28, 2004 transfer of business assets that was beset by economic difficulties and personality clashes which became apparent almost from the get-go. These problems spawned two related lawsuits[1] and an arbitration proceeding. In this, the later-filed action, the Plaintiffs seek specific performance under the terms of the Sales Agreement associated with the asset transfer, injunctive relief, and

---

[1]The first case, in which the Plaintiffs seek damages for breach of contract and tortious interference with contractual relations, is captioned Health Monitoring Services of America, Inc., v. Cardiac Telecom Corp., Civ. Action No. 06-0018. The outstanding Motion to Dismiss in that case is addressed in a separate Report and Recommendation.

damages for tortious interference with contract. Here, the court
addresses the Plaintiffs' Motion for Preliminary Injunction (Doc.
5). Because the Plaintiffs are unable to establish immediate and
irreparable harm, a showing essential to a grant of preliminary
injunctive relief, the court recommends that the Motion be
denied.

## II. **REPORT**

### A. **BACKGROUND**

#### 1. **Historical Facts**[2]

At the time of the asset transfer, Health Monitoring
Services of America ("HMSA"), a Florida corporation whose
principals were Martin Praeger("Praeger") and Mark Schermer
("Schermer"), was engaged in selling cardiac monitoring equipment
and services that allowed patients to remain at home during the
testing process. HMSA made these cardiac and other non-invasive
diagnostic tests available to doctors and hospitals nationwide,
marketing its products and services though independent sales
representatives.

Cardiac Telecom Corporation("CTC"), a Pennsylvania
corporation, was a competitor in the home health monitoring
industry. The centerpiece of its operation was the sale and

---

[2]This recitation of the facts is drawn primarily from the Report
and Recommendation issued in connection with the Plaintiffs' Motion to
Enforce Settlement Agreement in the related case, Civil Action No. O6-
0018.

2

servicing of home-based cardiac arrhythmia detection and alarm systems.

CTC's President and CEO, Lee Ehrlichman, was aware of HMSA's success in the field of remote cardiac monitoring and became convinced that HMSA services and equipment would mesh well with and allow CTC to expand its home healthcare business. HMSA and its principals agreed that this transfer of assets would benefit them as well.

In anticipation of the transaction, Praeger and Schermer formed a limited partnership, Medical Marketing Consultants, LLP ("MMC"), which was organized solely to assist CTC in marketing its expanded line of services and equipment. In order to carry out this marketing effort, MMC employed and entered into broker agreements with an experienced sales staff who had, until the transfer, sold on behalf of HMSA. These broker agreements contained provisions precluding the sales representatives from competing with MMC during the two year duration of the agreements and for an additional two years thereafter.

In October 2004, the two primary contracts underlying these cases were signed. The first, an Asset Purchase Agreement ("Purchase Agreement"), was made between HMSA, Praeger and Schermer, the sellers, and CTC, the buyer. This agreement covered cardiac monitoring equipment, computer software, and physician and group accounts formerly served by HMSA. It excluded accounts

3

receivable. Aside from account collection efforts, HMSA ceased doing business after the asset transfer.

CTC's primary obligations under the Purchase Agreement were to pay Praeger and Schermer $1,000,000 for physical equipment. They were also to pay MMC a percentage of the monthly revenue generated from sales to accounts transferred from HMSA, new accounts secured by the MMC sales force, and a small portion of CTC's telemetry business. These "earn out payments" were to continue for six years from the date of the Purchase Agreement or until total payments equaled or exceeded $10,548,000.[3] Under the terms of a Sales Agreement executed the same day as the Purchase Agreement: 1) CTC was granted the right to use MMC's sales representatives to market CTC's entire line of products and services; 2) the sales representatives remained MMC employees; 3) MMC was to pay the sales commissions and retain a percentage of the sales generated by its sales staff; and 4) CTC was not permitted to use, hire, or solicit MMC sales representatives without MMC's permission. In separate broker agreements each of

---

[3] Under an Equity Participation Agreement also executed at the time of the Purchase Agreement, CTC was to transfer shares of its business to MMC at certain revenue milestones. CTC, HMSA, Praeger, Schermer, and MMC also entered into a Security Agreement. As security for its obligations, CTC granted MMC a lien and security interest in the physical equipment and agreed to keep the secured assets free from any other encumbrance. A defined portion of CTC revenue was to be placed in a secured bank account. In the event of a default, MMC had the right to demand that its signature be required for all withdrawals and disbursements from this account.

4

the MMC sales representatives covenanted not to sell the products of a competitor.

Less than a year after execution of the agreements associated with the transfer of assets, the economic prospects of both MMC and CTC had deteriorated precipitously. Predictably enough, the parties place blame for the decline on each other. MMC blames CTC's lack of familiarity with the products and services transferred, poor management of the sales force, inadequate record keeping and staffing, poor customer relations, and inadequate service standards. MMC contends that it was unable to pay its sales representatives because CTC did not make payments to MMC.

CTC, on the other hand, traces the business debacle to questionable - if not illegal - business and billing practices employed by HMSA and its principals prior to and after execution of the asset transfer. As a result of these practices, former HMSA clients were dunned by insurance companies, questioned about bills, and required to return reimbursements received. Health care providers who associated CTC and those selling on its behalf with past and ongoing HMSA-related difficulties, no longer wanted to do business with CTC. The problem was exacerbated when former HMSA clients learned that HMSA had ceased doing business, and believed that CTC, too, was defunct. HMSA's efforts to collect on accounts receivable excluded from the transfer extended to CTC

5

clients, compounding the confusion. In sum, CTC contends that
HMSA's business practices tainted CTC's operation, grossly
diminishing the value of the assets purchased and impairing
recovery efforts.

CTC contends that in order to protect its assets from
becoming utterly worthless, it was necessary to deal directly
with MMC sales representatives; CTC had no choice but to pay the
sales force itself and to contract with some of the
representatives. According to CTC, this action was also
necessitated by the fact that even when CTC transmitted the
required monthly sales revenues to MMC, MMC failed to pay their
sales representatives. The representatives complained to CTC, and
were no longer motivated to sell CTC products.

MMC responds that it could not pay its sales staff because
CTC failed to honor its financial commitment to MMC, ceasing
payments under the contracts within a few months after they were
signed. MMC sent letters to the Defendants in July and December
2005, declaring that CTC had defaulted on its contractual
obligations by failing to make required earn out payments,
placing additional encumbrances on equipment and secured bank
funds, denying MMC's signature rights in the secured account, and
attempting to divert MMC's only asset - its sales
representatives. MMC argued that CTC received what it had
bargained for without paying. CTC contended that what it had

bargained for was worthless. Impasse was inevitable.

## 2. **Procedural History**

On January 6, 2006, HMSA, Praeger, and Schermer filed suit in Civil Action No. 0018 against CTC and Ehrlichman. In an Amended Complaint they alleged breach of the Purchase Agreement by CTC (Count I); breach of the Security Agreement by CTC (Count II); as an alternative to Count I, conversion of property conveyed to CTC under the terms of the Purchase Agreement(Count III); and tortious interference by Ehrlichman and CTC with the broker agreements made between MMC and its sales representatives (Count IV). On January 18, MMC also initiated arbitration proceedings against CTC with the American Health Lawyers Association.

On February 7, 2006, MMC filed this related civil suit against CTC and Ehrlichman for specific performance of the anti-solicitation provision of the Sales Agreement and for preliminary and permanent injunctive relief against CTC and Ehrlichman (Count I). MMC also seeks injunctive relief against CTC based on other violations of the Sales Agreement, including diversion of sales fees, failure to provide sales data, failure to honor MMC's signature rights, and failure to provide security for the sales fees (Count II). In Count III of the complaint, MMC seeks injunctive relief and damages for the Defendants' tortious

7

interference with broker agreements made between MMC and its sales personnel. Last, in Count IV, MMC seeks injunctive relief and damages based on Ehrlichman's alleged tortious interference with the anti-solicitation portion of the Sales Agreement.[4] A full-day hearing on the Plaintiffs' request for preliminary injunctive relief was scheduled for March 28, 2006.[5] Eleven days prior to that hearing, CTC sent a letter to the Plaintiffs purporting to terminate the Sales Agreement. CTC stated that MMC engaged in fraud in the inducement with respect to the Purchase Agreement, and that this breach of the Purchase Agreement released CTC from its obligations under the Sales Agreement. The hearing went forward.

At a status conference on April 19, 2006, the parties asked that rulings on outstanding motions in the related cases, *including the request for injunctive relief*, be deferred pending the outcome of settlement discussions. These discussions went on for months.

When the settlement was reduced to writing in late August 2006, however, the parties disagreed over one of its terms.

---

[4] The court recommended that the Plaintiffs' Motion to Dismiss Count IV of the complaint be granted without prejudice .(Doc.)

[5] At that hearing, the court was informed that days earlier MMC learned for the first time that CTC had sent a letter dated March 17, 2006 to MMC's defunct address purporting to terminate the Sales Representative Agreement on the basis of fraud. CTC claimed that the initial notice of termination had been included in a letter dated February 26, 2006.

The parties reinitiated and spent additional months engaged in further settlement negotiations. When, as of December 2006, they were unable to reach a compromise, the Plaintiffs filed a Motion to Enforce Settlement Agreement according to terms established in early August 2006.[6]

The court met with the parties on March 5, 2007, expressing concern about the length of the settlement process. It notified the parties that if a settlement could not be reached by March 28, a hearing would be held on the Motion to Enforce. The court also informed the parties that if the court declined to grant the Motion, it would rule promptly on the Plaintiff's request for preliminary relief. Settlement was not achieved. The hearing on the Motion to Enforce took place on March 16, 2007. The court recommends in a separate Report and Recommendation filed concurrently with this one, that the Motion to Enforce be denied.

Now, more than a year after the filing of the Motion for Preliminary Injunction and the hearing thereon, the court turns to the Plaintiffs' request for preliminary injunctive relief.

### 3. **Nature of the Preliminary Relief Requested**

The Plaintiffs ask here that the court: 1) bar CTC from further soliciting the MMC sales force; 2) require that CTC resume

---

[6]The Motion to Enforce was filed in the related case, Civ. Action No. 06-0018, but would, had it been granted, have resolved all outstanding issues in both cases.

9

payments to MMC in accordance with the formula set out in the
Sales Agreement; 3)declare CTC's attempt to terminate the Sales
agreement null and void; 4)order CTC to supply MMC with monthly
"hook-up" statistics allowing MMC to determine how much their
representatives have sold; 5) permit MMC to audit its books at
CTC expense; and 6) restore its security rights in the bank
account as provided for in the Sales Agreement. Before the court
can address whether the Plaintiff has satisfied the well-
established standards for injunctive relief, it must confront two
arguments raised by the Defendant, either of which could limit
the scope the court's consideration of the instant Motion. The
Defendants contend first that the Sales Agreement is null and
void. They also argue that the Arbitration Clause set out in the
Sales Agreement controls the legal aspects of this dispute, and
that the arbitration action is time-barred. The court turns first
to the arbitration-related issues.

## II. **THE LAW**

### A. **THE IMPACT OF THE ARBITRATION CLAUSE ON THE PENDING MOTION**

Because the Arbitration Clause included in the Sales
Agreement defines the scope of the court's authority to award
injunctive relief, the court discusses it briefly. Paragraph 16A
of the Sales Agreement provides: "Any controversy, dispute or
disagreement arising out of or relating to this Agreement, or the

10

breach thereof, shall be settled by binding arbitration

. . . ." (Motion for Prelim. Inj. Ex. 2 at ¶16A). Paragraph 16B

of the Sales Agreement further provides that a party seeking

resolution of a dispute over the terms of the Agreement is

required to "request arbitration not later than forty-five(45)

days after the occurrence of the event giving rise to the

arbitration request." Id.

Different provisions of the Agreement, however, govern

alleged violations of the contract's Anti-Solicitation Clause,

which is set out at Paragraph 6. The Anti-Solicitation Clause

reads, in pertinent part:

> Neither party shall employ, or seek to employ,
> during the term of this Agreement and for two
> (2) years after termination of this Agreement
> . . . any employee or independent agent of the
> other party that was employed or engaged by
> that other party at any time during the any
> [sic] term of this Agreement, without the
> written consent of the other party.

Id. Paragraph 7 establishes that claims arising under Paragraph

6[7] may be adjudicated in a court of law, rather that in an

arbitration proceeding:

> The parties specifically agree that the
> covenant[ ] in Paragraph[ ] 6 . . . [is]
> reasonable in both scope and duration. The
> parties further agree that because the
> remedies for a breach are inadequate and
> the result would irreparably harm the non-

---

[7]Paragraph Seven also applies to disputes arising under Paragraph
One of the Sales Agreement. Paragraph One, however, is not relevant to
the Motion being considered.

11

> breaching, the nonbreaching may, in addition
> to obtaining any other remedy available at
> law or in equity, including but not limited to
> reasonable attorneys' fees, enforce these
> covenants by obtaining an immediate injunction
> in a court of law or equity without the
> necessity of posting bond . . . .

Id.

The court is convinced that Paragraph 18G provides the

limitations period for actions brought pursuant to Paragraph 7.[8]

It reads:

> No action at law or in equity pertaining to any
> claim or controversy arising under this Agreement
> shall be maintained by either party against the
> other unless such action is commenced within one
> (1) year from the date when the cause of action
> arose.

The court cites these provisions in order to clarify its

conclusion that this action is not time barred, and that the

court's sole focus in evaluating the Plaintiffs' Motion for

Preliminary Injunction is on the Anti-Solicitation paragraph of

the Agreement. Disputes arising under any other Paragraph (with,

as the court has noted, the exception of Paragraph 1) are subject

to arbitration and cannot be considered here.

## B. **ENFORCEABILITY OF THE SALES AGREEMENT**

In one sentence of their brief, the Defendants contend that

---

[8]"[W]hen interpreting a contract a court must determine the
intent of the parties and effect must be given to all provisions in
the contract." Western United Life Assur. v. Hayden, 64 F.3d 833, 837
(3d Cir. 1995). The parties do not dispute that the one year
limitations period governs claims for equitable relief based on
Paragraph 6 of the Sales Agreement.

the Plaintiffs are not entitled to relief for CTC's alleged

breach of the Sales Agreement, because CTC terminated that

agreement for cause via formal notice on March 17, 2006. This

argument lacks merit.

Paragraph 12 of the Sales Agreement provides in relevant

part:

> During the Term, either party may terminate
> the Term of this Agreement immediately upon
> Notice, but only "for cause" defined as (i)
> the other party's material breach of this
> Agreement and failure to cure such breach
> *within fifteen (15) days notice of such*
> *breach*, (ii) the conviction of the other
> party for fraud, or (iii) the other party's
> bankruptcy and failure to dismiss an in-
> voluntary proceeding within 60 days of its
> commencement; provided that if the default
> cannot be cured by the payment of money and
> cannot reasonably be cured within such 15
> day period, then the cure period shall be
> extended for up to 90 days so long as the
> cure is promptly commenced and diligently
> prosecuted up to completion.

(Mot. Prelim. Inj. Ex. 2)(emphasis in original).

The May 17, 2006 letter from Ehrlichman to Praeger purports

to terminate the Sales Agreement for cause, alleging that MMC

breached the Agreement by "misrepresenting material facts in

order to fraudulently induce [CTC] to enter into the Agreement

and other contracts, failing to comply with the exclusivity

provisions of the Agreement, and failing to use commercially best

efforts to execute its duties and obligations to Cardiac

Telecom." (Doc. 15 Ex.2). In the same letter, Ehrlichman states

13

that MMC was provided with notice of these breaches more than fifteen days prior to May 17, "but has not taken efforts to cure the same." (Doc. 15 Ex .3). According to CTC, the notice to which Ehrlichman refers was provided in a February 24, 2006 letter from CTC counsel to counsel for MMC, and was sent to an address vacated by MMC following its eviction from those premises by CTC.

The court has reviewed the February letter and does not find any defensible basis for CTC's claim that the communication was intended to serve as the notice required in order to effect termination of the Sales Agreement. It is clear that the letter - prepared by an attorney sophisticated in commercial disputes - was written to explain CTC's refusal to honor MMC's request for signature rights in the secured CTC account. This conclusion is buttressed by the fact that none of the MMC sales staff was notified that the Agreement was no longer binding (Tr. 111-112, 150), and by the fact that CTC failed to notify the court or opposing counsel at a status conference held on March 15, 2006 that termination of the Sales Agreement had been initiated weeks earlier. This is especially true where the brief opposing the Plaintiffs' request for injunctive relief had been filed, and a hearing on that request was days away.

Having concluded that the Sales Agreement has not been terminated, and that the Arbitration Clause set out in the

Agreement does not preclude the court's consideration of
injunctive relief, the court turns next to the law detailing the
requirements for a grant of injunctive relief.

## C. **FACTORS RELEVANT TO THE REQUEST FOR INJUNCTIVE RELIEF**

"The test for preliminary relief is a familiar one. A party
seeking a preliminary injunction must show that 1) it has a
likelihood of success on the merits, 2) it will suffer
irreparable harm if the injunction is denied, 3) granting
preliminary relief will not result in even greater harm to the
nonmoving party, and 4) the public interest favors such relief."
Rogers v. Corbett, 468 F.3d 188, 192 (3d Cir. 2006)(quoting Kos
Pharms., Inc. v. Andrx Corp., 369 F.3d 700 (3d Cir. 2004)). The
function of this traditional test is to enable the court, on the
basis of the data before it, "to attempt to minimize the probable
harm to legally protected interests between the time that the
motion for a preliminary injunction is filed and the time of the
final hearing." Ortho Pharmaceutical Corp. v. Amgen, Inc., 882 F.
2d 806, 814 (3d Cir. 1989)(quoting Constructors Assoc. of Western
Pennsylvania v. Kreps., 573 F.2d 811, 815 (3d Cir. 1989)).

The first two factors bearing on the grant of preliminary
relief are mandatory; unless they are present, an injunction will
not issue. Adams v. Freedom Forge Corp., 204 F.3d 475, 484 (3d
Cir. 2000). The Plaintiffs bear the burden of proof with respect

15

to each relevant factor. P.C. Yonkers, Inc., v. Celebrations the
Party and Seasonal Superstore, 428 F.3d 504, 508 (3d Cir. 2005).
Only if the first two factors are established should the court
consider the remaining criteria.

## D. IRREPARABLE HARM

Unless the Plaintiffs are able to establish a realistic
threat of immediate irreparable harm, the court may not grant
preliminary injunctive relief "regardless of what the equities
seem to require." Adams, 204 F.3d at 484. MMC's allegations of
irreparable harm are straightforward. At the hearing on its
motion for injunctive relief, MMC argued that its only asset was
its sales force, and that its sole source of revenue was the fee
paid by CTC to compensate MMC for the use of those
representatives. (Tr. 27, 32). As a result, if MMC's relationship
with its sales force were undermined, or if the revenue stream
from those representatives were interrupted or ceased, dire
economic consequences would follow. (Tr. 27).

MMC alleged that CTC caused both of these things to happen.
At the time of the hearing, evidence was presented to show that
CTC was actively recruiting MMC sales representatives, roughly in
order of their productivity. (Tr. 131 , 137) These
representatives were offered incentives to join CTC, and were
encouraged to  sign contracts with CTC despite the non-compete

16

covenants in the brokerage agreements and the anti-solicitation provision in the Sales Agreement. (Tr. 237). As of the hearing date, CTC had also ceased sending revenue to MMC, and was paying MMC sales representatives directly. (Tr. 87, 107).

MMC argued that immediate relief was necessary in order to protect the goodwill and allegiance of its sales force and to avoid the company's dissolution. (Tr. 100-101). Despite the asserted need for immediate court intervention, MMC asked that the court defer ruling on the request for injunctive relief during the pendency of settlement negotiations. Those lengthy negotiations ultimately came to nought, and the court now finds itself, more than a year after the fact, faced with the Plaintiffs' unsupplemented allegations of immediate and irreparable harm. The court thus has before it only the record developed fourteen months ago.

The most compelling reason to grant injunctive relief, of course, is to prevent the judicial process from being rendered futile by the defendant's action or refusal to act. *See* Wright and Miller, Federal Practice and Procedure § 2947 at 424 (1973). Such relief is generally granted under the theory that there is an urgent need for immediate intervention to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, suggests at least a reduced need for imminent and extraordinary action. *See e.g.*, Citibank, N.A. v. Cititrust, 756

17

F.2d 273, 276 (2d Cir. 1985).

At this point, the court does not have any evidence before it to suggest that the demise of MMC is imminent. MMC has extremely modest overhead and other expenses. The record is also devoid of evidence showing that MMC retains a sales staff to whom it must pay commissions that are taken from revenue forwarded from CTC. (Tr. 88). An unspecified number of former MMC sales representatives now work under contract with CTC. When CTC began to solicit MMC's sales representatives, Plaintiff Schermer told at least one member of his staff that if she wanted to maintain her livelihood, she should sign with CTC. (Tr. 133). That same representative testified that some staff was lost to normal attrition. "[Representatives] come and they go. The reps sometimes work, and sometimes they don't work." (Tr. 132). To summarize bluntly the situation as it now stands, the harm threatened at the time of the hearing on the Motion for Preliminary Injunction has come to pass. The damage has been done, and, at this point, any injunctive relief that the court might award would be meaningless.

Barring CTC from soliciting the MMC sales force is futile; CTC has already siphoned off that portion of the sales force that it deemed most valuable, and other MMC sales representatives have left to work elsewhere. If - the court cannot say whether this is the case - MMC has a sales staff at all, that staff is not

18

alleged to be selling products and services on behalf of CTC; consequently, the fact that revenue payments are not being made by CTC is irrelevant to them and, in the context of this law suit, to MMC.

The court concludes that although the harm alleged to have been suffered is indeed serious, the harm threatened at this juncture cannot be deemed irreparable. The Court of Appeals for the Third Circuit has defined irreparable harm as"'that which cannot be repaired, retrieved, put down again, atoned for . . . Grass that is cut down cannot be made to grow again; but the injury can be adequately atoned for in money. The result of the cases fixes this to be the rule: the injury must be of a peculiar nature, so that compensation in money cannot atone for it . . . . Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate." In re Arthur Treacher's Franchisee Litigation, 689 F.2d 1137, 1146 (3d Cir. 1982)(internal quotations and citations omitted).

The denial of injunctive relief does not mean that MMC has no recourse for damage done to its business by CTC's alleged breach of the Sales Agreement. In fact, most of the injunctive relief requested - the hook-up statistics verifying sales made by former MMC representatives, the right to audit CTC's books, and restoration of rights conferred by the Security Agreement - is actually directed at establishing or guaranteeing repayment of

19

monetary loss. This information will undoubtedly be included in a discovery request as this matter progresses.

As the law makes clear, the court is not authorized to order CTC to make payments to MMC pending evaluation of the merits of this matter. *See* In re Arthur Treacher's Franchisee Litigation, 689 F.2d at 1145. (Stating: "[W]e have never upheld an injunction where the claimed injury constituted a loss of money, a loss capable of recoupment in a proper action at law.")  Furthermore, even if the court were permitted to impose a damage award at this point, it would not. At the hearing on the Motion for Preliminary Injunction, CTC represented that it, too, is in severe financial difficulty. Ordering CTC to make disputed payments at this point, would likely compromise CTC's ability to operate, resulting in important medical testing devices and services becoming unavailable or less readily available to the general public.

### E. **REMAINING FACTORS RELEVANT TO INJUNCTIVE RELIEF**

Because the Plaintiffs have failed to establish a likelihood of imminent irreparable harm, the court need not reach the remaining factors to be weighed in conjunction with a request for preliminary relief. *See* Adams, 204 F.3d at 484.

### IV. **CONCLUSION**

For the reasons detailed above, it is recommended that the

Plaintiffs' Motion for Preliminary Injunction (Doc. 5 ) be denied.

In accordance with the Magistrate's Act, 29 U.S.C. § 636 (b) (1) (B), 636 (b)(1)(b) and (c), and Rule 72.1.4 (B) of the Local Rules for Magistrates, Objections to this Report and Recommendation are due by June 15, 2007. Responses to Objections are due by June 25, 2007.

May 31, 2007.

/S/ Francis X. Caiazza
Francis X. Caiazza
U.S. Magistrate Judge

cc:

Counsel of Record
Via electronic mail

21